**R. A. HOLMAN & CO., Inc., Petitioner,**

**v.**

**SECURITIES AND EXCHANGE COM-
MISSION, Respondent.**

No. 419, Docket 30276.

United States Court of Appeals
Second Circuit.

Argued June 21, 1966.

Decided Sept. 21, 1966.

Sidney P. Howell, Jr., New York City (Rogers, Hoge & Hills, New York City, Arnold & Porter, Washington, D. C., and Richard A. Holman, New York City, with him on the brief), for petitioner.

David Ferber, Solicitor, Securities and Exchange Commission, Washington, D. C. (Philip A. Loomis, Jr., General Counsel; Edward B. Wagner, Special Counsel; and Theodore Sonde, Attorneys, Securities and Exchange Commission, Washington, D. C.; with him on the brief), for respondent.

Before WATERMAN, MOORE and KAUFMAN, Circuit Judges.

MOORE, Circuit Judge:

This is a petition by R. A. Holman & Co., Inc., a New York corporation formerly registered as a broker and a dealer under the Securities Exchange Act of 1934, Section 15(b), 15 U.S.C. § 78o(b), for review of an order of the Securities and Exchange Commission (SEC), revoking that registration, expelling petitioner from membership in the National Association of Securities Dealers, Inc., and making permanent an earlier SEC order which temporarily suspended the exemption from registration requirements of an offering of securities. Petitioner challenges the SEC order on grounds both of insufficiency of evidence and procedural defects.

A. The Sufficiency of the Evidence.

The order under review was based upon findings by the SEC that officers of the petitioner had made or caused to be made false and misleading statements and had otherwise willfully violated federal securities laws and regulations in connection with the offer and sale to the public of stock in two corporations: Precise Development Corporation (Precise) and Pearson Corporation (Pearson).

1. *The Offer and Sale of Precise Stock.*

R. A. Holman & Co. was registered with the SEC as a broker-dealer in September, 1958. Its first underwriting was of a Regulation A offering by Precise, a manufacturer of electronic equipment, of 60,000 units at $5 per unit, each unit consisting of one share of common stock and one share of preferred

convertible into four shares of common. The offering started on October 14, 1958, and was reported terminated on December 31, 1958, with the sale of 33,220 units.

 The evidence adduced supports the SEC's conclusion that R. A. Holman, the president and sole stockholder of R. A. Holman & Co., and R. A. Holman & Co. were guilty of a number of willful violations of the Securities Act and of the Securities Exchange Act in connection with the offer and sale of Precise stock.

Rule 10b–6, 17 C.F.R. § 240.10b–6, provides that it shall constitute a "manipulative or deceptive device or contrivance" under § 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), for an underwriter to purchase securities while he is still participating in their distribution. "Distribution" comprises "the entire process by which in the course of a public offering the block of securities is dispersed and ultimately comes to rest in the hands of the investing public." Lewisohn Copper Corp., 38 S.E.C. 226, 234 (1958). In the course of the Precise offering, petitioner allocated 13,000 units to the account of Ludwig J. Kabian on December 30, 1958, on a delayed delivery basis, payment not to be made until February 3, 1959. Kabian testified that he had been reluctant to take the units but that Holman had said he could cancel out if he wanted to and that it was on this basis that Kabian agreed to have the sale to him confirmed "with the right of turning them down." Holman testified that the sale was an ordinary "delayed delivery" sale. In January, after some investigation of the company, Kabian decided to cancel. Petitioner took the units back, and Holman bought them for himself. In March 1959 Holman put some 10,000 shares of Precise common into petitioner's trading account, and the shares were sold to the public.

Upon these facts, the SEC was justified in concluding that "distribution" was still in process until the stock originally allotted to Kabian was sold. A cancellation of a bona-fide purchase order will not reopen a distribution, where there was no reason for the underwriter to believe that the purchase order would be cancelled. Edgerton, Wykoff & Co., 36 S.E.C. 583, 586 (1955). Here, however, there was a real possibility at the time of purchase that Kabian would cancel; and it naturally made the offering appear better than it actually was to report that 33,200 shares were sold by December 31, 1958, without noting the questionable firmness of Kabian's commitment.

 Rule 15c1–5, 17 C.F.R. § 240.15c 1–5, provides that the term "manipulative, deceptive, or other fraudulent device or contrivance," used in § 15(c) (1) of the Securities Exchange Act, 15 U.S.C. 78o(c) (1), includes any act of a broker or dealer controlling the issuer of a security designed to effect or induce the purchase or sale of the security, unless the fact of control is disclosed in writing before the act. The record supports the inference that Holman was "controlling" Precise as of December 9, 1958, and it is certain that this fact was not disclosed to prospective subscribers to the distribution. At the end of August 1958, 130,000 shares of Precise common were outstanding: 55,000 in the name of Melville Byron, 75,000 in the names of Eugene and Albert Silber. By December 9, 1958, no more than 15,220 shares of the new offering had been sold, so that the total shares out were 145,220. On that day, the Silbers assigned their interest in their Precise stock to Holman, making him majority stockholder. To be sure, this stock was to be held in escrow, with restrictions on transferability, evidently to prevent its inclusion in the computation of the Regulation A offering; but the Silbers agreed to give Holman irrevocable proxies covering the stock. A Holman slate of directors was nominated, resigning only on May 30, 1959, when Holman and his company relinquished control to Byron.

 Finally, Holman and two of his company's employees, Eisenberg and

Powell, represented to customers that the stock would soon appreciate in value. There was, as the SEC found, no basis for these representations, which were therefore misleading and unjustifiable. See Berko v. SEC, 316 F.2d 137, 143 (2d Cir. 1963). Though the company had good product engineering and was in a growing field (stereo equipment), its financial history had been extremely unsatisfactory, it faced severe competition, and its difficulties had been reflected in the sharp drop in the market after the offering was closed uncompleted. Holman was aware of the scarcity of funds from which the company suffered—a scarcity not relieved by the unsuccessful offering.

2. *The Offer and Sale of Pearson Stock.*

The record also supports the SEC's conclusions as to the existence of willful violations by the petitioner in connection with the offer and sale of Pearson stock.

Pearson Corporation was a Rhode Island corporation which manufactured fiberglass boats. On March 30, 1959, it filed a notification and offering circular under Regulation A for the purpose of obtaining an exemption from the registration requirements of the Securities Act of 1933 with respect to a proposed public offering of 175,000 shares of common stock at $1 per share. Holman underwrote the issue and on October 29, 1959 reported that the offering had commenced on April 24th and was successfully completed on April 28, 1959. Between April 24th and 28th, Holman & Co. sold 15,000 shares to Holman, 4,000 shares to members of his immediate family, 12,500 shares to his close relatives, 1,500 shares to his secretary, and 8,100 shares to Stanley D. Halperin, Holman & Co.'s counsel, who later became Holman's law partner. The stock rose quickly in the after-market, tripling within a week. On April 28, 1959, Holman & Co. repurchased the shares sold to Halperin, and 4,500 of those sold to the secretary and to one relative. Other repurchases from Holman, his family and relatives, and the secretary amounted to about 6,500 shares in May, 13,700 shares from June to September, and about 6,000 shares in November and December.

The SEC found these activities to be violative of the securities laws, in that the distribution lasted until the resale to the public of stock repurchased from Holman's relatives and affiliates; that the plan of purchase by affiliates and repurchase and resale by petitioner was never disclosed; that the repurchase by petitioner violated Rule 10b–6, since the distribution was still going on; and that it was misleading to say that the offering price to the public was to be $1 per share, since petitioner envisaged allocating a large portion of the 175,000 shares said to be "publicly" offered to his affiliates, with a view to repurchase and resale to the public within a short period after the offering was announced to be closed.

■ The record supports the conclusions of the Commission. The interval between purchase by the affiliates and repurchase and sale to the public was so short that it seems likely that it was part of a preconceived plan with manipulative effects: the allocation to relatives would create an artificial scarcity of shares available to people genuinely interested in investment, which in turn would make for an artificially stimulated ("hot") after-market, in which the affiliates could unload their shares.

Petitioner argues that he was unfairly surprised, since the SEC had not previously forbidden participation by affiliates of the underwriter in a new issue, and indeed had not permitted disclosure of the fact that officers and affiliates of the underwriter intended to invest in the offering. However, the SEC decision with respect to the Pearson offering does not rest upon a prohibition of underwriter investment in the offering underwritten, but rather upon a disapproval of purchases by affiliates of the underwriter in order to create an illusion of scarcity and with a view to quick resale at "hot" prices in the after-market. Such disapproval had previously been made explicit in Lewisohn Copper Corp.,

38 S.E.C. 226, which was promulgated on March 18, 1958—a number of months before the commencement of the offering in Pearson.

█ In addition, the record indicates that between August 1959 and March 1960 Holman & Co. in several instances sent confirmations of sales of Pearson stock to customers who had not in fact agreed to purchase such securities. Although the transactions appear to have involved fairly minor amounts, such confirmations of unauthorized transactions are violative of the anti-fraud provisions of the securities acts. Shelley, Roberts & Co., 38 S.E.C. 744, 751 (1958).

B. The Fairness of the Proceedings.

Petitioner contends that even if the evidence against it was substantial enough to support the revocation of its registration and the rest of the SEC order, the proceedings before the SEC were invalid for failure to comply with standards of procedural fairness set forth in the Administrative Procedure Act and inherent in the due process clause of the Constitution.

1. *Separation of Prosecutorial and Adjudicatory Functions.*

Byron D. Woodside was Director of the Division of Corporation Finance in the SEC from prior to March 30, 1960, until July 15, 1960, on which latter date he was appointed a member of the Commission itself. The proceedings leading up to the order under review started on September 16, 1960, when the SEC temporarily suspended the Regulation A exemption from registration of the Pearson offering discussed above. Commissioner Woodside was one of the three Commissioners who voted to issue this order. On September 26, 1960, the SEC ordered public proceedings to be held to determine whether or not to revoke petitioner's broker-dealer registration or to suspend or expel it from membership in the National Association of Security Dealers, Inc., because of petitioner's conduct in the Pearson offering. In October 1960, the SEC consolidated the proceedings concerning the suspension of exemption of the Pearson offering and the proceedings concerning petitioner's broker-dealer registration, and designated William W. Swift as the hearing officer in the consolidated proceedings. In November 1960, charges concerning the offering of Precise stock were added to those concerning the Pearson offering in the registration revocation proceedings.

On May 11, 1962, the Court of Appeals for the District of Columbia handed down the decision in Amos Treat & Co. v. SEC, 113 U.S.App.D.C. 100, 306 F.2d 260. In that case, the SEC had started a public hearing to determine whether or not Amos Treat & Co.'s broker-dealer registration should be revoked and whether or not it should be expelled from NASD. The firm sought an injunction against further prosecution of the proceedings, contending that the proceedings were contrary to due process in that Commissioner Manuel F. Cohen was participating in the revocation proceedings, although he had been Director of the Division of Corporation Finance at the time it had begun formal investigation of the registration out of which the revocation proceedings arose. The District of Columbia Circuit held that the proceedings should be enjoined on the ground that Commissioner Cohen was disqualified and indicated that new revocation proceedings could be commenced in which he would not participate. The Court stated:

"We are unable to accept the view that a member of an investigative or prosecuting staff may initiate an investigation, weigh its results, perhaps then recommend the filing of charges, and thereafter become a member of that commission or agency, participate in adjudicatory proceedings, join in commission or agency rulings and ultimately pass upon the possible amenability of the respondents to the administrative orders of the commission or agency. So to hold, in our view, would be tantamount to that denial of **administrative due process against**

which both the Congress and the courts have inveighed."

306 F.2d 260, 266–267.

On May 28, 1962, the SEC in the case at bar handed down an order denying petitioner's motion for the disqualification of the hearing officer. The SEC opinion indicated that Commissioner Woodside had participated in the denial of the motion. This was the first time his participation had been disclosed. On June 1, 1962, petitioner moved—as it had done before—that the Commission furnish the names of the Commissioners who had participated in the SEC's orders and rulings in the consolidated proceedings. The SEC declined to furnish this information. Petitioner then sought an injunction against further proceedings, on the basis of the decision in *Amos Treat & Co.* The District Court for the District of Columbia granted the injunction requested; the Court of Appeals reversed, distinguishing *Treat* on the grounds that in that case the Commission did not deny that Commissioner Cohen had to some extent participated in the investigation of the registration before he became Commissioner, whereas in this case the SEC affidavits asserted that there was no participation by Commissioner Woodside before his appointment to the Commission, either in processing Holman's applications or in the recommendations by the staff that a public hearing be held. The Court went on to say that the claims of Holman & Co. should be heard in the first instance at the administrative level, subject to judicial review when the proceeding is finally resolved.

"The party asserting disqualification must make his record in the administrative hearing. While the scope and nature of that inquiry has never been fully delineated, it must be sufficient to allow the challenging party to introduce whatever relevant evidence he possesses bearing on disqualification since he, of course, has the burden of proof."

SEC v. R. A. Holman & Co., 116 U.S. App.D.C. 279, 323 F.2d 284, 287, cert. denied, 375 U.S. 943, 84 S.Ct. 350, 11 L.Ed.2d 274 (1963).

In November 1963 petitioner requested the issuance of subpoenas *ad testificandum* upon Commissioner Woodside, several SEC staff members, and a former Commissioner, evidently with a view to procuring their testimony as to the participation of Commissioner Woodside in the investigation of petitioner before he became a Commissioner. The hearing examiner denied the request and the Commission affirmed the denial, stating that in light of the formal sworn denials by SEC officials that Commissioner Woodside did not participate while director in the investigation of petitioner, petitioner had not made an adequate showing to warrant the issuance of the subpoenas. Commissioner Woodside participated in this ruling of the Commission.

The hearings concluded on January 16, 1964. The hearing examiner handed down his recommended decision on November 4, 1964. Oral argument on review before the Commission was held on March 4, 1965. At that time Commissioner Woodside announced his decision not to be present during oral argument and not to participate in the consideration or decision of the review. The Commission published its findings and opinion on December 15, 1965, Chairman Cohen and Commissioner Woodside not participating.

■ Petitioner now contends that the entire proceedings were invalid because of the participation of Commissioner Woodside, or, in the alternative, because the SEC refused to permit the petitioner to make inquiry into the possible disqualification of Commissioner Woodside. As to the first point, we do not think the record before us establishes that Commissioner Woodside was disqualified within the meaning of the *Treat* case. The District of Columbia Circuit itself distinguished *Treat* from this case, on the grounds that here there was no evidence that the Commissioner sought to be disqualified had participated in an investigation of petitioner before becoming a Commissioner. In *Treat*, Commis-

sioner Cohen had been head of the Division of Corporation Finance when that division conducted an informal investigation and began a formal investigation of the Treat firm. He had been told the results of the investigation by his staff and had appeared on behalf of his division before the Commission in connection with other registrations in which the Treat firm was named as underwriter, in order to discuss the general policy to be followed with respect to the firm. In this case, there is no indication that Commissioner Woodside, before his appointment to the Commission, participated in any investigation of petitioner's activities, and public proceedings to investigate petitioner's activities were not started until September 16, 1960—two months after Woodside's appointment to the Commission. To disqualify Commissioner Woodside on the record before us would be tantamount to disqualifying from participation in an SEC adjudicatory proceeding all personnel from the Divisions of Corporation Finance and Trading and Exchanges without regard to the extent of their connection with the proceeding in its investigatory stages, and would tend to prevent the appointment to the Commission of persons who have had previous experience with its work. See 3 Loss, Securities Regulation 1877–89 (2d ed. 1961) (outlining the membership of the Commission and its staff, and pointing out that as of 1961, 14 of the 38 Commissioners had seen earlier service on the staff before their appointment to the Commission). The record here does not show that Woodside was "engaged in the performance of investigative or prosecuting functions" in any proceedings related to the present case, so as to be barred by Section 5(c) of the Administrative Procedure Act from participation in adjudicatory proceedings against the petitioner. Contrast also American Cyanamid Co. v. FTC, 363 F.2d 757 (6th Cir. 1966).

Nor did the SEC unduly restrict petitioner's inquiry into the possible disqualification of Commissioner Woodside. If the Commission had refused to divulge anything at all about the nature of the preliminary investigation into petitioner's activities, and Woodside's role in that investigation, this would be an unfair restriction of an inquiry into possible disqualification and, if permitted, would render the *Treat* decision a meaningless admonition, easily circumvented. However, in this case the SEC has made extensive disclosures, upon sworn statements, as to the nature of the investigation and as to Woodside's role in it. The answer of the SEC in the action by petitioner for an injunction brought in the District of Columbia denied that Commissioner Woodside had participated in any informal investigation of petitioner's activities in connection with Pearson's registration statement; denied that Woodside had acquired substantial knowledge of the facts in issue; admitted that Commissioner Cohen, who succeeded Woodside first as Acting Director and then as Director of the Division of Corporation Finance, acquired some knowledge of the facts about petitioner's activities; pointed out that because of the large number of registrations each year, the Director of the Division of Corporation Finance is not acquainted with most of the registration statements; stated that the proceedings against petitioner stemmed from an investigation of a registration statement filed by Pearson Corporation on March 30, 1960, and that this investigation and the subsequent informal investigation of the earlier Regulation A offering and the trading in Pearson stock were under the supervision of Charles H. Eisenhart, then Assistant Director of the Division of Corporation Finance; that investigation of trading activity began in July 1960; and also stated that a formal investigation of petitioner's trading practices started on August 4, 1960. An affidavit by Charles H. Eisenhart corroborated many of these statements. In his affidavit, Eisenhart stated that he did not discuss the Pearson registration statement with the Director of the Division of Corporation Finance until after July 15th, when Woodside was no longer director.

 These sworn statements on their face adequately disclosed the nature of the preliminary investigation and of Woodside's role. In light of these statements, petitioner, who had the burden of proof on the disqualification issue, as the District of Columbia Circuit recognized, 323 F.2d at 287, was obliged either to offer evidence contradicting the sworn statements of the Commission, or to point out the inadequacy and inconsistency, if any, in the sworn statements, before he was entitled to subpoena the Commission members and staff.

### 2. The Qualifications of the Hearing Examiner.

William W. Swift was designated as the hearing examiner in the proceedings against the petitioner in October 1960. On May 15, 1962, petitioner moved to disqualify Swift, on the grounds that he had passed the mandatory retirement age and was serving at the will of the Commission. Petitioner relied in large part upon Section 11 of the Administrative Procedure Act, which provides that examiners "shall be removable by the agency in which they are employed only for good cause established and determined by the Civil Service Commission * * * after opportunity for hearing and upon the record thereof," and that examiners "shall receive compensation prescribed by the [Civil Service] Commission independently of agency recommendations or ratings." The hearing examiner and the SEC denied motion for disqualification, both on the merits and on the grounds that the motion was not timely.

Swift was first employed by the SEC as a hearing examiner in 1936. He reached the mandatory retirement age of 70 on October 31, 1957. On November 1, 1957, he received a temporary appointment for a period up to one year under the Civil Service Retirement Act, 5 U.S.C. § 2263(a), which provides:

"Notwithstanding any other provision of law, an annuitant heretofore or hereafter retired under this chapter shall not, by reason of his retired status, be barred from employment in any appointive position for which he is qualified. An annuitant so reemployed shall serve at the will of the appointing officer."

He was informed at the time he received notice of his temporary reappointment that "in accordance with Section 13(a) of the Civil Service Retirement Act, you may be separated at the will of the appointing officer." He has since been reappointed each year, at each time being informed that he was subject to separation at the will of the appointing officer.

 We do not find it necessary to consider the merits of petitioner's motion for disqualification, since we conclude that petitioner's challenge to the qualifications of the hearing examiner was not timely, as required by § 7(a) of the Administrative Procedure Act.[1] Petitioner did not move to disqualify Swift until hearings had gone on for one and a half years and 8,000 pages of testimony had been recorded. We cannot accept the petitioner's contention that it was not aware until April 1962 that Swift was over the mandatory retirement age of 70. The hearing examiner's age must have been obvious at the beginning of the hearings in December 1960, at which time Swift was over 73. The failure to challenge Swift's qualifications on the grounds of his temporary reappointment over the retirement age at some early stage of the proceedings precludes the raising of a similar objection at this point.

Petitioner contends that the one-sentence ("The judgment is reversed") per

1. 5 U.S.C. § 1006(a), which provides in pertinent part that the officer presiding over the taking of evidence "may at any time withdraw if he deems himself disqualified; and, upon the filing in good faith of a timely and sufficient affidavit of personal bias or disqualification of any such officer, the agency shall determine the matter as a part of the record and decision in the case."

curiam decision in Riss & Co. v. United States, 341 U.S. 907, 71 S.Ct. 620, 95 L. Ed. 1345 (1951), stands for the proposition that any challenge to the qualifications of the hearing examiner is timely so long as it is made while the hearings are still going on. We do not find the *Riss* case, which is readily distinguishable from the case at bar, authority for any proposition as broad. In *Riss*, the hearings lasted only seven days, and the common carrier did not learn until the last day of the hearings that the examiner was not an examiner appointed under § 11 of the A.P.A. 96 F.Supp. 452, 453 (W.D.Mo.1950). Moreover, *Riss* has been qualified by the subsequent decision in United States v. L. A. Tucker Truck Lines, Inc., 344 U.S. 33, 73 S.Ct. 67, 97 L.Ed. 54 (1952), which held that an objection to the qualifications of the examiner would not be heard unless an "appropriate objection" to his qualifications was made and overruled during the hearings. Cf. also Long Beach Fed. Sav. & Loan Ass'n v. Federal Home Loan Bank Bd., 189 F.Supp. 589, 612 (S.D. Cal.1960), rev'd on other grounds, 295 F.2d 403 (9th Cir. 1961).

3. *Other Alleged Procedural Irregularities.*

 Petitioner asserts that other procedural irregularities vitiated and invalidated the proceedings against it. It first contends that it was improperly denied access to certain ex parte communications from the SEC staff to the SEC with respect to the consolidation of the proceedings against petitioner and the amendment to include the Precise stock as well as the Pearson stock. However, we agree with the Commission that it was not required to divulge the communications in question which merely concerned the nature of the proposed proceedings. Lack of access to the communications in no way affected petitioner's ability to defend himself. Nor were the communications the ex parte communications forbidden by § 5(c) of the Administrative Procedure Act, since no "adjudication" was yet under way, see § 2(d) of the act, and since § 5(c) does not apply "to the agency or any member or members of the body comprising the agency." See Amos Treat & Co. v. SEC, 113 U.S.App.D.C. 100, 306 F.2d 260, 266 (1962) (the exclusionary phrase just quoted permits "a Commissioner to participate in a decision of the Commission that an investigation go forward and even that charges be filed to the end that an adjudicatory proceeding might be initiated"). See also H.R.Rep.No.1980, 79th Cong., 2d Sess. 31 (1946); U.S. Code Congressional Service 1946, p. 1195; S.Rep.No.752, 79th Cong., 1st Sess. 18 (1945).

 Nor was it error for the hearing examiner to prevent petitioner from establishing that other broker-dealers were engaged in transactions in Pearson and Precise stock during the periods in question on certain days. The SEC conceded that such trading went on. It is hard to see how such testimony would be other than cumulative, if not irrelevant, since proof of such trading did not tend to refute the charges against petitioner.

 As to the entries made on petitioner's books by Klapper, a staff witness who was petitioner's cashier at the time the entries were made, it is hard to see how they were a "statement" which the SEC was required to divulge under the Jencks case, see NLRB v. Adhesive Products Corp., 258 F.2d 403 (2d Cir. 1958). Nor was it prejudicial error for the SEC to rule with respect to a statement of a witness obtained during investigation that petitioner's counsel could examine the statement only in the presence of the hearing examiner or of a staff member and could not make copies of it, though he could examine it at length and ask for a recess to examine it. This ruling did not unduly impair counsel's ability to use prior statements of witnesses for purposes of impeachment—the rationale underlying Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957).

Affirmed.