366 F.2d 456
 SECURITIES AND EXCHANGE COMMISSION, Plaintiff-Appellee,
v.
R. A. HOLMAN & CO., Inc., Richard A. Holman and Irving Bienenstock a/k/a Irving Burns, Defendants-Appellants, and
Ben F. Harburger and Henry N. Budoff, Defendants.
 No. 418.
 Docket 30039.
 United States Court of Appeals Second Circuit.
 Argued June 21, 1966.
 Decided September 21, 1966.
 
 Sidney P. Howell, Jr., New York City (Marie V. Driscoll, Richard A. Holman, and Rogers, Hoge & Hills, New York City, with him on the brief), for appellants.
 David Ferber, Solicitor, Securities and Exchange Commission, Washington, D. C. (Philip A. Loomis, General Counsel, and Martin D. Newman, Attorneys, Securities and Exchange Commission, Washington, D. C., with him on the brief), for appellee.
 Before WATERMAN, MOORE and KAUFMAN, Circuit Judges.
 MOORE, Circuit Judge:
 
 
 1
 The case at bar was commenced on March 15, 1963, by the filing in the District Court for the Southern District of New York of a complaint by the Securities and Exchange Commission (SEC), charging that R. A. Holman & Co., Inc., a New York securities firm; Richard A. Holman, its president; and three salesmen of the firm, Irving Bienenstock (also known as Irving Burns), Ben F. Harburger, and Henry Nathan Budoff; had violated § 17(a) of the Securities Act of 1933 [15 U.S.C. § 77q (a)] and § 15(c) (1) of the Securities Exchange Act of 1934 [15 U.S.C. § 78o (c) (1)], in connection with the offer and sale to the public of stock in Pearson Corporation during the preceding six months. The relief requested was an injunction against further violations. After trial without a jury, the trial judge adopted as his own the findings of fact, conclusions of law, and judgment proposed by the SEC, and entered a permanent injunction against each of the defendants except Budoff, who had consented to the entry of a separate permanent injunction against him before trial. From this judgment R. A. Holman & Co., Holman, and Bienenstock appeal.
 
 
 2
 The basic question on appeal is the sufficiency of the evidence before the trial court that appellants had violated the cited statutory provisions, which proscribe, in connection with the purchase, offer, or sale of any securities which involves the use of the mails or of any instrumentality of interstate commerce, the employment of any fraudulent or deceptive device or contrivance, and the obtaining of money or property "by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading * * *."
 
 
 3
 Appellants also challenge the verbatim adoption by the trial court of the SEC's proposed findings and conclusions. Although this practice has been criticized, e. g., Roberts v. Ross, 344 F.2d 747 (3d Cir. 1965); see United States v. El Paso Natural Gas Co., 376 U.S. 651, 656-657, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964), it is not grounds for reversal, and the findings of fact and conclusions of law thus adopted will stand if supported by the evidence. See United States v. El Paso Natural Gas Co., supra. For reasons discussed below, we conclude that the evidence before the trial court justified most, if not all, of his findings, and warranted the issuance of the injunction under appeal.
 
 
 4
 We should state at the outset that Pearson Corporation, whose stock appellants sold, was not, in contrast to the companies involved in many securities fraud cases, a "fly-by-night" company. Pearson, a Rhode Island corporation, produced and still produces an outstanding line of fiberglass boats. Its sales had grown rapidly since its organization in 1956. On January 1, 1961, the company merged with the aluminum-boat manufacturer Grumman Boats, Inc., a subsidiary of Grumman Aircraft Engineering Corp. The merger resulted in Grumman Aircraft's ownership of over 61% of the outstanding capital stock of Pearson. Around this time, Grumman Aircraft helped Pearson obtain much-needed long-term financing. Although Pearson suffered a net operating loss of $272,003 in 1961, it had shown modest profits in 1958, 1959 and 1960. A return to profitable operation was a distinct possibility.
 
 
 5
 We may also state at the outset that we are not convinced that all of the statements and omissions described by the trial court were materially misleading under the circumstances in which they were made (or not made). For example, appellants never disclosed that some of the Pearson stock they were selling had been acquired for investment and not with a view towards distribution to others. The shares in question had been obtained in 1960 through the exercise by Holman & Co. of warrants it had been given in connection with a 1959 offering of Pearson stock under Regulation A. See R. A. Holman & Co. v. SEC, 2 Cir., 366 F.2d 446, decided this day. At the time Holman & Co. exercised the warrants, it furnished a certificate that it was acquiring the shares for investment and not with a view to resale. The SEC maintains, and the trial court held, that appellants should have told their customers not only that Holman & Co. was acting as "principal" in selling Pearson stock — a disclosure appellants did make — but also that Holman & Co. had taken the stock for investment. The SEC maintains that a prospective purchaser might well want to know why a stock originally taken for investment was now being sold. We do not believe that this omission was materially misleading. Holman & Co. had already disclosed that it was selling for its own account. To disclose that it had taken the stock "for investment" a number of years before, since the warrant contract required that a certificate of investment purpose be given to the company, would have added little to what the customer had already been told. Moreover, the SEC had never previously suggested that any such disclosure be made. Cf. NLRB v. Majestic Weaving Co., 355 F.2d 854 (2d Cir. 1966).
 
 
 6
 Nor was it more than mildly misleading for Holman & Co. to report in its market letter of January 1962 that it estimated Pearson's sales in 1961 to be "between $4 million and $5 million." The market letter was prepared before final figures for the year were available, and the discrepancy between the figures estimated and the final sales figure of $3,874,870 is not very large. It is true, however, that the letter was overly optimistic in portraying a large jump over 1960 sales of $3,086,972, and that the letter should not have been sent out without qualification once the final figures became available.
 
 
 7
 Apart from these few instances, the record more than adequately supports the trial court's findings as to the existence of materially misleading statements and omissions. Several examples may be briefly summarized.
 
 
 8
 The market letter of January 1962, sent out to customers even after September 1962, spoke of Pearson's "financial strength," pointing in particular to "a healthy current asset-liability ratio of 2.68 to 1." It neglected to point out that much of the "health" of this ratio resulted from a transaction in February 1961, by means of which a current liability in the amount of $625,000 was changed to a long-term debt on the books of the company.
 
 
 9
 A number of verbal representations made by appellant Bienenstock were also materially misleading. Several customers testified that Bienenstock told them that there was only a limited supply of Pearson stock available. Appellants contend that these statements were correct, since they were no more than statements by Bienenstock that he had authority only to issue a certain amount of shares at the price under discussion, which was both true and apparently in accord with standard over-the-counter practice. This contention is refuted by the testimony of the customers, which makes clear that Bienenstock was talking about a limited supply at any price — which was not true. It was also materially misleading and untrue for Bienenstock to tell a customer, as he did, that the reason Pearson stock had not gone up was because a large shareholder had dumped 10,000 shares on the market. It was true that a large Pearson shareholder was selling at the time, but he had sold only 1,090 shares. Bienenstock also predicted that Grumman Aircraft would soon participate more closely in the affairs of Pearson, in which it already had an interest, although at the time these predictions were made Grumman Aircraft had formulated no such plans; and they indicated — without any basis in fact — that Grumman would try to get Navy contracts for Pearson. Bienenstock also said that the stock would rise to specified prices, which he named (predicting to some customers that the price would more than double in a matter of three months), partly as a result of interest which would be generated in the stock by the forthcoming 1963 New York Boat Show. It is true that Pearson stock often appeared at near-term high levels at the start of the Boat Show in previous years; but it is also true that in 1961 and 1962, the price of the stock was less at the close of the Boat Show than it had been at the beginning. It was materially misleading to tell prospective purchasers of the former phenomenon, without also informing them of the latter. Moreover, the specific price predictions made by Bienenstock during his telephone conversations were themselves violative of the antifraud provisions of the federal securities laws, since no adequate basis existed for representations so optimistic. See Berko v. SEC, 316 F.2d 137, 143 (2d Cir. 1963).
 
 
 10
 Finally, neither in the material mailed out nor in telephone conversations with prospective customers did Holman or his salesmen disclose that Pearson had suffered a net loss of $272,000 before taxes in 1961. Appellants urge that the material they mailed out, if carefully read, would have revealed the existence of a loss of some size in that year, since it mentioned the existence of a loss carry-forward, and a note to an income statement disclosed that had it not been for the loss carry-forward federal income tax liability would have amounted to $84,407. However, in order to deduce from this that there was a significant loss in 1961, one would have to join the statement about the loss carry-over with statements in Holman & Co.'s market letter which indicated that in past years (other than 1961), the firm had shown a profit; and even if one were astute enough to do all this, and to calculate the minimum size of the loss from the fact that the loss carry-over was large enough to eliminate income tax liability for the first half of 1962, one would have known only that the loss was at least of the order of $163,000 — not that it amounted to $272,000. The size of the 1961 loss was unquestionably a fact to which "a reasonable man would attach importance * * in determining his choice of action in the transaction in question," namely, whether or not it was advisable to buy Pearson stock. List v. Fashion Park, Inc., 340 F.2d 457, 462 (2d Cir.), cert. denied, List v. Lerner, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965).
 
 
 11
 The picture which emerges from the record, in short, is of a high-pressure sales campaign relying in substantial part on materially misleading statements and omissions. The trial court was justified in enjoining further violations of the federal securities laws, and the judgment below accordingly is affirmed.