**Bernard J. KAYNE, Plaintiff,**

v.

**PAINEWEBBER INCORPORATED, and Thomas W. Forsberg, Defendants.**

**No. 86 C 6646.**

United States District Court, N.D. Illinois, E.D.

Jan. 19, 1989.

limitations, which clearly applies to employ- ment discrimination actions. 812 F.2d at 844.

Scott W. Wilton, Williams, Rutstein, Goldfarb & Sharp, Ltd., Chicago, Ill., for plaintiff.

Michael B. Roche, L. Andrew Brehm and Karen A. Mieszala, Schuyler, Roche & Zwirner, Chicago, Ill., for defendants.

## MEMORANDUM OPINION

BRIAN BARNETT DUFF, District Judge.

Plaintiff Bernard J. Kayne originally filed a five-count complaint against the se-

curities firm PaineWebber, Inc. ("PaineWebber") and one of its employees, Thomas W. Forsberg, alleging violations of § 10(b) of the Securities Exchange Act of 1934 ("§ 10(b)"), 15 U.S.C. § 78j(b), and Securities and Exchange Commission Rule 10b–5 ("Rule 10b–5"), 17 C.F.R. § 240.10b–5, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., the Illinois Consumer Fraud and Deceptive Practices Act, Ill.Rev.Stat. ch. 121–½, § 261 et seq., and Illinois common law. The complaint was filed on September 4, 1986, and alleged that Forsberg, acting as plaintiff's broker, effected unauthorized purchases of the securities of two companies, Ventrex, Inc. and Minerals, Inc., for plaintiff's account at PaineWebber. It also alleged that, after plaintiff discovered the unauthorized transactions, Forsberg induced plaintiff not to notify Forsberg's superiors at PaineWebber, first through false assurances that he would cancel the transactions and then through threats of financial ruin.

PaineWebber subsequently moved to dismiss the original complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. This court granted the motion on the securities claims on the grounds that unauthorized trading alone does not violate § 10(b) or Rule 10b–5, and that Forsberg's fraudulent acts—i.e., the false post-purchase assurances that he would cancel the transactions—were not "in connection with" the purchase of the securities as required by the statute and the rule. *Kayne v. PaineWebber*, 86 C 6646, Minute Order (January 12, 1988). The court denied the motion on the RICO and state law claims. *Id.*

PaineWebber then moved to compel plaintiff to submit these claims against it to arbitration, pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 et seq. The motion was predicated on an arbitration clause ("the Arbitration Clause") in plaintiff's Customer Agreement with PaineWebber. The clause provided that:

Any controversy between us arising out of or relating to this contract, breach thereof, or any account(s) maintained with you (except any claim for relief by a public customer for which a remedy may exist pursuant to an express or implied right of action under the federal securities laws) shall be settled by arbitration. . . .

The court granted the motion, thereby removing PaineWebber from the lawsuit. *Kayne v. PaineWebber*, 684 F.Supp. 978 (1988).

On June 1, 1988, plaintiff filed an amended two-count complaint against PaineWebber under § 10(b) and Rule 10b–5. The amended complaint deletes the allegations of unauthorized trading in the Mineral's stock, but adds substantially to the allegations concerning Forsberg's unauthorized purchases of Ventrex stock. The allegations of the new complaint (and relevant exhibits) are as follows.

On July 22, 1985, plaintiff opened a margined securities account at PaineWebber with Forsberg as plaintiff's account executive. The account was a non-discretionary one, so that before Forsberg could purchase securities for plaintiff, he had to obtain plaintiff's permission. If plaintiff received a report of an executed order that he did not authorize, he had to immediately notify PaineWebber in writing or the report was conclusive.

Later that year, Forsberg devised and implemented a plan in which he purchased a large amount of Ventrex stock for his own account, and then, in order to raise the value of his stock, made unauthorized purchases of Ventrex stock for the accounts of many of his clients. Two of these purchases, 20,000 shares on August 13, and 50,000 shares on September 11, were credited to plaintiff's account.

When plaintiff received the reports of these transactions, he immediately notified Forsberg that he had not authorized them, and insisted that they be reversed. Forsberg initially assured him that they would be, but when time passed and nothing was done, plaintiff told Forsberg that he was going to report the transactions to Forsberg's superiors. At this point, Forsberg threatened that if plaintiff did so Forsberg would recommend to his other clients that

they sell the stock of another company in which plaintiff had a substantial investment.

In time, plaintiff did report the unauthorized transactions to PaineWebber. After repeated demands that the transactions be cancelled, the Ventrex stock was finally sold from his account at a loss of more than $50,000.

Plaintiff states his § 10(b) and Rule 10b–5 claims in two counts. Count I alleges fraud in Forsberg's failure to disclose that the unauthorized purchases were for the purpose of manipulating the price of the Ventrex stock. Count II alleges fraud in Forsberg's failure to notify plaintiff that the purchases were being made at all, and in Forsberg's subsequent representations that he would immediately reverse the transactions. Plaintiff seeks to hold PaineWebber responsible for the fraud as a controlling person pursuant to § 20(a) of the Securities Exchange Act, 15 U.S.C. §§ 78*o* and 78t(a). PaineWebber has moved to dismiss the amended complaint, or in the alternative, to compel arbitration.

## DISCUSSION

The first issue this court faces, one not discussed by the parties, is the proper order in which to proceed. PaineWebber asks the court to first rule on the motion to dismiss and then, if that motion is denied, to turn to the motion to compel arbitration. In its earlier ruling, however, this court explained that arbitrators are as qualified as courts to rule on the sufficiency of pleadings, and that a defendant "generally may not 'forum-shop' by first asking a court to examine the merits of [the] claims and then, if displeased with the result, demanding that the court send them to an arbitrator." *Kayne v. PaineWebber*, at 981. Thus, the court will first address the motion to compel arbitration.

*The Motion to Compel Arbitration*

The question of whether a claim brought in federal court is subject to arbitration is, first and foremost, a matter of contract law. *See Shearson American Express, Inc. v. McMahon*, 482 U.S. 220, 107 S.Ct. 2332, 2337, 96 L.Ed.2d 185 (1987); *Giles v.*

*Blunt, Ellis & Leowi, Inc.*, 845 F.2d 131 (7th Cir.1988). With *McMahon*'s ruling that § 10(b) and Rule 10b–5 claims are arbitrable, it is now settled that the Arbitration Clause in plaintiff's agreement with PaineWebber requires this court to compel arbitration here unless the clause specifically excludes it. *See Dickinson v. Heinold Securities, Inc.*, 661 F.2d 638, 643 (7th Cir.1981).

The Arbitration Clause provides for the arbitration of all controversies arising between plaintiff and PaineWebber, with the exception of those delineated in a parenthetical ("the Exception Clause"). The Exception Clause excepts from arbitration "any claim for relief by a public customer for which a remedy may exist pursuant to an express or implied right of action under the federal securities laws." Since § 10(b) and Rule 10b–5 claims are implied rights of action under the federal securities laws, plaintiff reasons that PaineWebber cannot force him to arbitrate these claims. PaineWebber contends, however, that the Exception Clause must be read in its historical and legal setting.

In *Wilko v. Swan*, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953), the Supreme Court held that a predispute agreement to arbitrate claims arising under § 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l*(2), could not be enforced. Section § 10(b) comes from the Securities Exchange Act of 1934, and hence did not fall within the expres ruling of *Wilko*, but the Securities Exchange Commission ("SEC") interpreted *Wilko* as applying to § 10(b) claims, and subsequently promulgated a rule making it unlawful "for a broker or dealer to enter into an agreement with any public customer which purports to bind the customer to the arbitration of future disputes between them arising out of the federal securities laws, or to have in effect such an agreement, pursuant to which it effects transactions with or for a customer." SEC Rule 15c2–2, 17 C.F.R. 15c2–2. After *McMahon* was decided, the SEC rescinded the rule. *See SEC Rescinds Fraud Arbitration Rule*, Fed. Sec. Law

**1338**

Rep. (CCH) No. 1255 at 1 (October 21, 1987).

PaineWebber contends that because the Exception Clause in plaintiff's Customer Agreement was drafted and executed prior to *McMahon,* it should be read as pertaining only to claims nonarbitrable under governing law, and that because § 10(b) and Rule 10b–5 claims are now arbitrable, the Exception Clause no longer applies. It cites a number of cases decided in the year and a half since *McMahon* issued in which courts have compelled arbitration of federal securities claims despite the presence of pre-*McMahon* arbitration clauses indicating that federal securities claims were non-arbitrable. *See Sease v. PaineWebber, Inc.,* 697 F.Supp. 1190 (S.D.Fla.1988); *Ketchum v. Almahurst Bloodstock IV,* 685 F.Supp. 786 (D.Kan.1988); *Willis v. Rubiera–Zim,* No. 87 C 1121, slip op. (D.N.J. Jan. 20, 1988); *Frankel v. Shearson Lehman Brothers,* No. 86 C 2520, slip op. (D.N.J. Oct. 30, 1987) [1987 WL 39934].

There is no doubt that a properly drafted pre-*McMahon* arbitration clause could have provided for arbitration of federal securities claims in the event that such claims were held to be arbitrable. For example, the arbitration clause at issue in *McMahon* read:

> Unless unenforceable due to federal or state law, any controversy arising out of or relating to my accounts, to transactions with you for me or to this agreement or the breach thereof, shall be settled by arbitration.

*McMahon,* 107 S.Ct. at 2335–6. This clause clearly provided that § 10(b) and Rule 10b–5 claims would be non-arbitrable only if such claims were non-arbitrable at the time they were brought. Once the Court held that such claims were arbitrable, the clause no longer barred arbitrating them.

It is equally indisputable, however, that certain pre-*McMahon* arbitration clauses simply did not provide for the arbitration of § 10(b) and Rule 10b–5 claims even after *McMahon.* In *Giles v. Blunt, Ellis & Loewi, Inc.,* 845 F.2d 131 (7th Cir.1988), for instance, the Seventh Circuit had no trouble ruling that the securities firm could not compel arbitration of § 10(b) claims when the arbitration clause read as follows:

> If any controversy arises between us in connection with my accounts it *may* be settled by arbitration.... I understand that my entering this agreement bars me from pursuing any claims not arising under the federal securities laws in court, *but does not bar me from pursuing claims based solely on alleged violations of the federal securities laws in a judicial forum* rather than in arbitration.

*Id.* at 132 (emphasis added by the Seventh Circuit). The express terms of this contract thus prevented the securities firm from compelling arbitration of the securities laws claims despite the change in law effected by *McMahon.*

PaineWebber insists that the Exception Clause in plaintiff's Customer Agreement is more akin to the clause in *McMahon*—i.e., that it excepts arbitration only of such claims are as non-arbitrable at the time the Arbitration Clause is being enforced. Yet, a plain reading of the clause reveals the error in this argument. The clause excepts from arbitration *any* "claim for relief by a public customer for which a remedy may exist pursuant to an express or implied right of action under the federal securities laws," not "any claim for relief that may be non-arbitrable." Indeed, the meaning of the clause appears so clear that the court would find PaineWebber's argument frivolous were it not for two cases involving clauses identical to the one at issue here in which the courts compelled arbitration of securities claims.

In *Sease,* the district court held that the securities laws claims were arbitrable under this clause solely on the basis of the SEC's rescission of Rule 15c2–2. *Sease,* at 1193. Since the court did not even attempt to explain how arbitration can be compelled when the contract does not allow for it, PaineWebber does not seriously rely on this case, and this court will not explore it further.

In *Willis,* however, the court did attempt to reconcile its ruling with the express language of the arbitration provision. Ac-

cording to that court, the clause is ambiguous, and thus subject to a construction in accordance with public policy concerns:

> Plaintiff asserts that the arbitration clause is "clear on its face" and thus must be enforced as written without reference to extrinsic facts. I disagree. The ambiguity is created by the "may exist" language in the instant arbitration clause. I could have found the contract to be clear and unambiguous if it had read: Any controversy between us ... (except any claim for relief by a public customer for which a remedy *exists* pursuant to an expressed or implied right of action under the federal securities laws), shall be settled by arbitration.... While the clause clearly means to limit arbitration, it is unclear from the language itself whether "may exists" specifically excludes the arbitration of § 10(b) or Rule 10b–5 claims in light of the *McMahon* decision.

*Willis*, slip op. at 4 (emphasis in original). The court then ruled that, in light of the strong federal policy favoring arbitration, arbitration should be compelled. *Id.* at 5–7.

With due respect, the *Willis* court was wrong. The term "may exist" within the clause clearly refers to the phrase "any claim for relief." Had the clause excepted "any claim for relief ... for which a remedy *exists* pursuant to ... the federal securities laws," the securities firm would arguably have been locking itself into liability for *causes of action* existing at the time the contract was executed, even if those causes of action were subsequently re-voked by Congress or the courts. The clause as written ensured that the firm would be subject to liability only for securities claims in existence at the time they were brought. *McMahon* did not do away with § 10(b) or Rule 10b–5 claims, it merely held that such claims can be arbitrated. The "may exist" language has nothing to do with whether or not claims that do exist may be sent to arbitration. Accordingly, PaineWebber's motion to compel arbitration must be denied.

*The Motion to Dismiss*

PaineWebber moves to dismiss the complaint on two grounds: that it fails to state a claim for relief, and that it is barred by the statute of limitations. The court will address these arguments in turn.

1. The Complaint States Section 10(b) Claims

■ To recover under § 10(b) or Rule 10b–5, a private plaintiff must do three things. First, he must show that he has standing to sue—i.e., that he is either a purchase or a seller of a security. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). He must then prove that the defendant violated the statute[1] or the rule.[2] *Beck v. Cantor*, 621 F.Supp. 1547, 1553 (D.C.Ill.1985); *see also Gochnauer v. A.G. Edwards & Sons, Inc.*, 810 F.2d 1042, 1046 (11th Cir.1987); *Harris v. Union Electric Co.*, 787 F.2d 355, 362 (8th Cir.1986). Finally, he must show that the violation caused him to sustain a loss. *Bastian v. Petren*, 681 F.Supp. 530, 533 (N.D.Ill.1988).

---

1. Section 10(b) provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange—

> \* \* \* \* \* \*

(b) To sue or employ, in connection with the purchase and sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

2. Rule 10b–5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any scheme, device or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of circumstances in which they were made, not misleading, or

(c) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

PaineWebber does not contest plaintiff's standing as a purchaser of Ventrex stock, but does contend that plaintiff can establish neither a § 10(b) or rule 10b–5 violation nor that any violation that did occur caused plaintiff's $50,000 loss.

### a. *The § 10(b) Violations*

■ To prove a § 10(b) or Rule 10b–5 violation, plaintiff must show that Forsberg committed fraud in connection with the purchase of the Ventrex stock. *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977). PaineWebber's argument that plaintiff cannot do so begins with this court's earlier ruling that unauthorized trading alone—that is, the mere failure to disclose that unauthorized trades are being made—does not amount to securities fraud. PaineWebber then argues that plaintiff's additional allegation regarding Forsberg's failure to disclose his manipulative scheme to drive up the price of the Ventrex stock (Count I), and false assurances that he would sell the stock after plaintiff learned of the unauthorized transactions (Count II), still do not entitle plaintiff to bring a § 10(b) or Rule 10b–5 claim because, even if such conduct was fraudulent, it was not "in connection with" plaintiff's purchase of the stock.

PaineWebber's argument on this score with respect to Count I relies on two Seventh Circuit opinions addressing the "in connection with" requirement, *Congregation of the Passion, Holy Cross v. Kidder Peabody & Co., Inc.*, 800 F.2d 177 (7th Cir.1986) and *O'Brien v. Continental Illinois Bank & Trust Co.*, 593 F.2d 54 (7th Cir.1979). In *Congregation of the Passion* and *O'Brien*, the Seventh Circuit ruled that an investor who has delegated the entire authority to make investment decisions to his securities broker may not sue the broker under § 10(b) or Rule 10b–5 for misuse of his delegated powers. The Court said that while such an investor is a "purchaser," and thus has standing under *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), he cannot bring a § 10(b) claim because, having relinquished to the broker all authority to make investment decisions, he

has made no decision "in connection with the purchase ... of a security." The broker's wrongdoing may have violated a contractual or fiduciary duty, but it did not violate the securities laws. *E.g., O'Brien v. Continental Illinois Bank & Trust Co.*, 593 F.2d at 60. *Compare Norris v. Wirtz*, 719 F.2d 256 (7th Cir.1983) (trust beneficiary could sue trustee under § 10(b) because the trust document gave her the right to, and she did, approve the securities transactions).

PaineWebber analogizes *Congregation of the Passion* and *O'Brien* to the situation here. Because Forsberg's purchase of Ventrex stock for plaintiff's account was totally unauthorized, PaineWebber contends, plaintiff made no investment decision and, accordingly, § 10(b) and Rule 10b–5 do not apply. As a matter of logic, this argument has force. To be sure, the plaintiffs in *Congregation of the Passion* and *O'Brien* delegated the decision-making power whereas here Forsberg usurped it. But here, just as in the two Seventh Circuit cases, plaintiff made no investment decision prior to the purchase. Thus, PaineWebber argues, plaintiff's remedy here should be limited to claims for breach of the contractual (or fiduciary) relationship between him and Forsberg.

Yet, the circumstances of this case differ in one fundamental respect from *Congregation of the Passion* and *O'Brien*. In those cases, the only fraud alleged was that against the plaintiffs. When the Court said that it "could not *imply a violation* of § 10(b) and Rule 10b–5 when the plaintiff transferred to [the defendant] full authority to make investment decision," *Congregation of the Passion*, 800 F.2d at 181 (emphasis added), it really meant that there *was* no violation of the statute or the rule because the fraud was not in connection with the purchase of a security. Courts imply—really, infer—rights of action, not violations, and the only question in those cases, given the Court's determination that the plaintiff had standing to assert a § 10(b) and Rule 10b–5 claim, was whether or not the defendant had violated the statute or the rule. *See also Capalbo*

*v. PaineWebber, Inc.*, 672 F.Supp. 1048, 1051–52 (N.D.Ill.1987). *Compare Costello v. Oppenheimer & Co., Inc.*, 711 F.2d 1361, 1368 (7th Cir.1983) (affirming judgment against defendant for churning, which involves excessive trading by broker with full discretion to invest for customer, because "churning, as a matter of law, is considered a violation of § 10(b) and Rule 10b–5").

Here, by contrast, PaineWebber does not contend that Forsberg's scheme to manipulate the price of Ventrex stock did not violate the securities laws.[3] Instead, PaineWebber insists that even if Forsberg's scheme was unlawful, plaintiff still cannot sue because he made no investment decision. Although the argument is not unreasonable in light of the Seventh Circuit's explication of its *Congregation of the Passion* and *O'Brien* rulings, it is wrong. The "in connection with" requirement is part of the substantive law, not a separate element of § 10(b) standing. Since plaintiff has sufficiently pleaded both his standing as well as Forsberg's violation of § 10(b) and Rule 10b–5, *see Nye v. Blyth, Eastman, Dillon & Co.*, 588 F.2d 1189 (8th Cir.1978) (unauthorized trading accompanied by a manipulative or fraudulent intent in connection with the purchase of a security can result in liability for losses resulting from the unauthorized trades), the only question that remains for Count I is whether the violation caused plaintiff's loss, an issue to which the court will soon return.

Before doing so, however, the court must first address PaineWebber's argument that the "in connection with" requirement defeats Count II because the fraud alleged in this count—Forsberg's false assurances that he would sell the wrongfully purchased Ventrex stock—occurred after the purchase. PaineWebber made and prevailed on this exact argument against nearly identical allegations in the original complaint. On further reflection, however, this court now finds that the allegations do state a § 10(b) and Rule 10b–5 claim.

This court predicated its initial dismissal of these allegations on the long line of cases holding that where fraudulent acts induce an individual to retain securities, the fraud is not in connection with the purchase or sale of the securities. *Kayne v. PaineWebber*, January 12 Minute Order (citing *Freschi v. Grand Coal Venture*, 767 F.2d 1041, 1049 (2d Cir.1985); *Beck v. Cantor*, 621 F.Supp. 1547 (D.C.Ill.1985); *Bosio v. Norbay Securities*, 599 F.Supp. 1563 (E.D.N.Y.1985)); *see also, e.g., Rush v. Oppenheimer & Co., Inc.*, 592 F.Supp. 1108 (S.D.N.Y.1984). That ruling was based on the assumption that plaintiff actually purchased the Ventrex stock at the time Forsberg made the purchase.

This assumption was not justified by the pleadings. According to the complaint, Forsberg's purchases were completely unauthorized. If so, then plaintiff did not purchase the Ventrex stock until he subsequently ratified Forsberg's purchases by failing to immediately object to them in writing, a failure plaintiff attributes to Forsberg's false assurances that he would take care of it. This being so, Forsberg's fraud preceded plaintiff's actual purchase of the Ventrex stock, and was thus in connection with the purchase for the purposes of § 10(b) and Rule 10b–5.

Moreover, even were this court to find that the purchases occurred at the time Forsberg made them, the court would still allow Count II to stand. With the added allegations in the amended complaint plaintiff has sufficiently alleged that the unauthorized purchases were undertaken with the intent to deceive plaintiff into retaining them. This fraudulent intent provides the "something more" required to turn unauthorized trading into securities fraud. *Corbey v. Grace*, 605 F.Supp. 247, 252–53

---

**3.** Although § 10(b) and Rule 10b–5 cases usually involve misrepresentations or omissions, the statute and the rule also proscribe "manipulative practices intended to mislead investors by artificially affecting market activity." *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 476, 97 S.Ct. 1292, 1302, 51 L.Ed.2d 480 (1977). Plain-

tiff's allegations that Forsberg devised and implemented a scheme to drive up the price of Ventrex stock in order to sell his own shares at an artificially inflated price would appear to fall well within this proscription. *See R.A. Holman & Co. v. Securities & Exchange Commission*, 366 F.2d 446, 451 (2d Cir.1966).

(D.Minn.1985). Accordingly, plaintiff has alleged a violation of the securities laws in Count II.

### b. *Causation*

Having alleged § 10(b) and rule 10b–5 violations in Counts I and II, plaintiff still must establish that the violations caused his losses on the Ventrex stock. In securities fraud cases, two types of causation must be proved—"transaction causation" and "loss causation." *LHLC Corp. v. Cluett, Peabody & Co.*, 842 F.2d 928, 931 (7th Cir.1988); *Huddleston v. Herman & MacLean*, 640 F.2d 534, 549 (5th Cir.1981), *aff'd in part and rev'd in part on other grounds*, 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983); *Bastian v. Petren*, 681 F.Supp. at 533–36 (discussing cases).

■ "Transaction causation" refers to the causal relationship between the violation and the securities transaction. The plaintiff must show that the securities violation proximately caused him to make his investment.

■ "Loss causation," on the other hand, refers to the causal nexus between the violation and the plaintiff's economic loss. Manipulative or fraudulent conduct may result in an individual engaging in a transaction he would not have otherwise, but if the reasons for the plaintiff's subsequent loss on the transaction are not related to the misconduct or misrepresentations perpetrated by the defendant—e.g., if the price of the security falls for reasons separate and apart from the securities fraud—then a cause of action will not lie.

■ PaineWebber first argues that, while Count I pleads transaction causation inasmuch as the purchases were part of Forsberg's alleged scheme, it fails adequately to plead loss causation because there are no specific allegations that the scheme caused plaintiff to purchase his Ventrex shares at an artificially inflated price, or caused the value of these shares to fall subsequent to the purchase. Plaintiff responds that, although the complaint does not make these allegations in terms, a liberal reading of the complaint allows such causation to be inferred. He is right.

Although it certainly would have been preferable for plaintiff to have articulated his loss causation theory in his complaint, there is no need for this court to dismiss Count I and thereby initiate another round of pleadings and Rule 12(b)(6) motions. Plaintiff has explained in his briefs that his causation theory rests on the simple market principle that when demand increases, price increases, so that Forsberg's purchases of stock for plaintiff's account, which followed the broker's purchase of stock for himself and others, must have taken place at an artificially inflated price. That is correct, and need not be set forth in the complaint to survive the motion to dismiss. To recover, plaintiff will have to devise some way of attributing the losses he incurred to the manipulative scheme, but at this stage the principles of supply-and-demand suffice to plead that at least some of his losses were caused by Forsberg's wrongs. Accordingly, Count I states a § 10(b) and Rule 10b–5 claim.

PaineWebber next argues that Count II fails to plead loss causation because Forsberg's alleged misrepresentations—i.e., that he would cancel the unauthorized purchases—were in no way related to the subsequent decline in the value of the Ventrex stock. This argument demonstrates a misunderstanding of the loss causation requirement.

■ In most § 10(b) and Rule 10b–5 cases, the plaintiff has agreed to purchase a security based on the defendant's misrepresentations or omissions about it. In these cases, the loss causation requirement means the plaintiff must prove that he would not have suffered the loss—i.e., the price of the security would not have fallen—had the facts been as he believed them to be. Here, however, plaintiff alleges that, had the facts been as he believed them to be, he would not have made the purchases at all. In such a case, transaction causation and loss causation merge: Since the plaintiff believed he was making no investment at all, he neither would have invested (transaction causation) nor suffered a loss

(loss causation) had the facts been as he believed them to be. Accordingly, Count II adequately alleges loss causation, and PaineWebber's motion to dismiss on this score must be denied.

## 2. The Claims Are Not Barred by the Statute of Limitations

■ PaineWebber's last argument for dismissal of the complaint is that plaintiff's claims are time-barred. PaineWebber first argues that the Supreme Court's ruling in *Agency Holding Corp. v. Malley–Duff & Associates*, 483 U.S. 143, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987), mandates a change in the limitations period for § 10(b) and Rule 10b–5 claims from three years to one. It then asserts that, although some of Forsberg's allegedly unlawful acts occurred within one year of the filing of the original complaint—the Ventrex purchases occurred on or about August 13 and September 11, 1985 and the complaint was filed on September 4, 1986—the amended complaint, dated June 1, 1988, does not relate back to the date of the original and is thus barred by the one year limitations period.

In *Norris v. Wirtz*, 818 F.2d 1329 (7th Cir.1987), the Seventh Circuit reaffirmed that, in this circuit, § 10(b) and Rule 10b–5 claims take their limitations period from analogous state law. *See also Parrent v. Midwest Rug Mills, Inc.*, 455 F.2d 123, 126 (7th Cir.1972). In Illinois, the relevant provision is the Illinois Securities Act, Ill.Rev. Stat. ch. 121–½, ¶ 137.13 D, which provides for a three year limitations period. Although the Court in *Norris* opined that it would have made more sense for federal courts to have looked to express federal rights of action in choosing a limitations period for § 10(b) and Rule 10b–5's implied cause of action, "it is too late for an inferior court to turn back the clock." *Norris v. Wirtz*, 818 F.2d at 1333.

PaineWebber insists, however, that it is not too late, pointing to the Supreme Court's ruling in *Agency Holding Corp.*, issued a month after *Norris*, that "the federal policies that lie behind RICO and the practicalities of litigation make the selection of the four-year statute of limita-

tions for Clayton Act actions, 15 U.S.C. § 15b, the most appropriate limitations period for RICO actions." 107 S.Ct. at 2767. According to PaineWebber, *Agency Holding Corp.* authorizes—no, mandates—a single limitations period for § 10(b) and Rule 10b–5 claims, and that this period should be the one-year period set forth in §§ 9(e), 18(c), and 29(b) of the Securities Exchange Act of 1934 and § 13 of the Securities Act of 1933. PaineWebber further notes that, in *In re Data Access Systems Securities Litigation*, 843 F.2d 1537 (3d Cir.1988), the Third Circuit sitting en banc relied on *Agency Holding Corp.* in determining that the one-year limitations period established by Congress for express rights of action under the securities laws should apply as well to § 10(b) and Rule 10b–5 claims.

The reasoning of the Third Circuit in *Data Access Systems* is compelling. Its reasoning in *Hill v. Equitable Trust Co.*, 851 F.2d 691 (3d Cir.1988), however, is not. In the later case, the Court held that its ruling in *Data Access Systems* should be applied retrospectively, so that cases arising prior to that change in the law would be barred if they did not meet the more stringent one-year limitations period. Although the *Hill* court implied at times that it was deciding only whether *Data Access Systems* should be applied retrospectively under the specific facts in *Hill*, the Court appears to have held, and PaineWebber certainly relies on it as holding, that the new one-year limitations period would be applied retroactively in all cases. To the extent the Court so held, this court cannot follow its lead.

In *Chevron Oil Co. v. Huson*, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), the Supreme Court held that a newly announced rule of law should not be applied retrospectively when (1) the new rule overrules clear past precedent on which litigants may have relied, (2) its purpose and effect would not be substantially furthered by retrospective application, and (3) imposing the rule retroactively would impose hardship or injustice. *Id.* at 106–07, 92 S.Ct. at 355. Together, these factors weigh in favor of retaining the three-year

limitations period in this (and most) § 10(b) and Rule 10b–5 cases that have accrued prior, at least, to this ruling.

The first and third factors clearly weigh against retrospective application of the new rule: A one-year period would represent an overruling of clear past precedent, and would create an injustice for those litigants who have relied on the Seventh Circuit's repeated application of a three-year limitations period in § 10(b) and Rule 10b–5 cases.[4] *See Chevron Oil Co. v. Huson,* 404 U.S. at 107–08, 92 S.Ct. at 355–56 (declining to apply change in applicable limitations period retroactively). As for the second factor, it is true that the adoption of a standard one-year limitations period for all § 10(b) and Rule 10b–5 cases would clarify some of the confusion created by the prior approach of looking to analogous state law. Nevertheless, courts in this district have become quite adept at applying Illinois law to § 10(b) and Rule 10b–5 claims, and any clarification that would result could not possibly outweigh the force of the first and third factors. *See In re Data Access Systems Securities Litigation,* 843 F.2d at 1553 (Seitz, J., dissenting); *cf. Anton v. Lehpamer,* 787 F.2d 1141, 1145 (7th Cir. 1986) (declining to apply new two-year limitations period in § 1983 suits retroactively).

Accordingly, this court holds that even if the one-year limitations period of the express federal rights of action should govern § 10(b) and Rule 10b–5 claims, this rule should not be applied retrospectively. PaineWebber's motion to dismiss based on its statute of limitations defense therefore must be denied.

### CONCLUSION

PaineWebber's motion to dismiss or, in the alternative, to compel arbitration is denied.

---

**4.** PaineWebber does not argue that, and thus this court need not decide whether, there is something special in the facts of this case, as there might have been in *Hill,* that would warrant applying a one-year limitations period retrospectively here despite this court's broad ruling that the one-year period should not be so applied.